UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

JIMMY RAY GLASS,

        Plaintiff,     Civil Action No. 14-11153
               Honorable Nancy G. Edmunds
     v.         Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 11]

Plaintiff Jimmy Ray Glass brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.  RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Glass is not disabled under the Act is not supported by substantial evidence  Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [11] be DENIED, Glass's motion [10] be GRANTED IN PART to the extent it seeks remand, and DENIED IN PART to the extent that it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Recommendation.

## II.    REPORT

### A.    Procedural History

Glass originally filed an application for SSI, which was denied, on March 17, 2011.  [Tr. 59-62].  He filed a new application for SSI on June 15, 2011, alleging disability as of July 15, 2008.  [Tr. 129-144].  That application was denied.  [Tr. 63-67].  Thereafter, Glass filed a timely request for an administrative hearing, which was held on September 12, 2012 before ALJ Andrew G. Sloss.  [Tr. 29].  Glass, who was represented by attorney David M. Stewart, testified at the hearing, as did vocational expert ("VE") Pauline McEachin.  [Tr. 29]  On November 17, 2012, the ALJ issued a written decision in which he found Glass not disabled.  [Tr. 12-27].  On January 16, 2014 the Appeals Council denied review.  [Tr. 1-3].  Glass filed for judicial review of the final decision on May 16, 2014.  [1].

### B.    Background

#### 1.    Disability Reports

In his July 15, 2011 application for SSI, Glass alleged a disability onset date of July 15, 2008.  [Tr. 136].  Glass stated that he was prevented from working by learning disabilities, loss of memory, and "bad back neck arms."  [Tr. 141].  Prior to stopping work, Glass worked variously as a mechanic, on an assembly line, as a machine painter, and in machine maintenance from 1992-2007.  [Tr. 128].  Glass indicated that he treated with Dr. Adelbaset Youssef, the Hamilton Community Health Network, and Hurley Medical Center.  [Tr. 144-146].  At the time of his application, Glass reported taking several medications, including Alprazolam (for anxiety), Carisoprodol (for muscle relaxation), Fluoxetine (for depression), and Lortab (for pain).  [Tr. 144].

In an August 23, 2011, function report, Glass said that he lives in the basement of a

friend's home.  [Tr. 148].  He reported that his daily activities consist of preparing food, taking medications, washing and dressing himself, sitting on the couch, and watching television.  [Tr. 148, 152].  However, Glass asserted that his ability to dress, bathe, care for his hair, and shave are limited by his injuries.  [Tr. 149].  He stated that he does not perform any other indoor or outdoor household chores.  [Tr. 150].  Glass said that he is able to count change, but unable to pay bills, handle a savings account, or use a checkbook.  [Tr. 151].  He requires reminders to perform activities outside of the home, and requires accompaniment.  [Tr. 152].

When asked which activities are limited by his condition, Glass checked lifting; squatting; bending; standing; reaching; walking; sitting; kneeling; stair-climbing; seeing; memory; completing tasks; understanding; following instructions; and using his hands.  [Tr. 153].  He can walk for about 20 minutes before needing to rest, pay attention for 10 minutes, and reported having trouble finishing what he starts.  [*Id.*].  Apparently confused by some of the questions in the function report, Glass replied to the question "how well do you follow written instructions," with "cannot write anything," and in response to the question "how well do you follow spoken instructions," he stated "about 5 min."  [*Id.*].  He stated that he has no trouble with authority figures, but does not handle stress or changes in routine well.  [Tr. 154].  Glass reported the use of a cane, brace or splint, and glasses or contacts every day.  [Tr. 154].

In an undated disability appeals report, Glass stated that he suffered additional injuries to his left hand, neck, and knees due to a car accident on August 4, 2011.  [Tr. 156].  He reported seeking further care from Dr. Youssef for treatment of his neck, knee, arm and hand pain, and for treatment of anxiety and depression.  [157].  Glass also reported visiting the Genesys Regional Medical Center at Health Park hospital for treatment of the injuries he sustained in that car accident.  [Tr. 158].  Glass reported that he was still taking Lortab (for pain), Soma (for pain),

3

and Xanax (for anxiety and depression).  [Tr. 158].

## 2.      *Glass's Testimony*

At the September 7, 2012 hearing before the ALJ, Glass testified that he completed the 11th grade, had no job related training or certifications, and last worked in 2008.  [Tr. 31].  Glass said that he suffers from a "bad back," "bad knees," "bad ankles," and pain in his hands and shoulders.  [Tr. 32].  He stated that his medications, including Prozac (for depression) and Xanax (for anxiety), are helpful in treating his maladies.  [*Id.*].  Regarding his physical ailments, Glass testified that he suffers from significant pain, has great difficulty lifting objects with his left hand, and loses his balance.  [Tr. 33].  He recounted having surgery on his hands, but decided against back surgery because it was not covered by his insurance and because it was only somewhat likely to improve his condition.  [*Id.*].

Glass said that he lives with his girlfriend, and that he performs no household chores. [Tr. 34-35].  He stated that he attempted to use a riding mower, but that the vibration of the machine created severe pain in his hands, and that he passed that duty to his grandson.  [Tr. 35]. Glass attested that he participates in few social outings due to his depression, and that he spends most of his time sitting distractedly in front of the television.  [Tr. 35].

Glass testified that he cannot lift a gallon of milk with his left hand, which he considers so functionally limited that it is "dead to [him]."  [Tr. 36].  He stated that he can stand for approximately 15 minutes comfortably.  [*Id.*].  He asserted that he can walk about half of one city block before he is forced to sit down by tingling in his legs and shortness of breath.  [*Id.*]. He also described breathing problems that resulted from his time working as a painter.  [*Id.*]. Glass said that he cannot sit for more than 25 or 30 minutes, and struggles to find a comfortable sitting position.  [Tr. 37].

4

Glass stated that he had difficulty passing his driving test, and is unable to fill out forms on his own.   [Tr. 38].   He feels dizzy when looking down, and experiences migraines approximately three or more times per week.  [Tr. 39].  He recounted falling over if he attempts to bend down, cannot crawl, and is unable to climb steps unless a handrail is present.  [Tr. 39-40].

Glass stated that he has used a back brace "for a long time," and began using a cane about five months before the hearing.  [Tr. 40].

### 3.   *Medical Evidence*

On July 18, 2001, Dr. Eugene Brown of The MRI Diagnostic Centers of Michigan examined an MRI of Glass's spine, which he characterized as a "normal lumbar spine study." [Tr. 199].  On May 2, 2007, Dr. Madhusudana Tummala reviewed a new MRI of Glass's spine, finding "minimal circumferential bulging of the intervertebral disc at L4-L5 and to a lesser degree at L3-L4."  [Tr. 198].

On July 18, 2008, Glass was examined at the Hurley Medical Center after suffering trauma to his left arm, where it was determined that he was unable to completely flex or extend his left elbow.  [Tr. 178-179].  It was also noted that Glass was unable to grasp a piece of paper between his thumb and index finger.  [Tr. 179].  He was prescribed Vicodin ES, Flexeril, and Prednisone.  [Tr. 180].  A July 19, 2008, x-ray of Glass's left elbow revealed no abnormalities in the bone or soft tissues.  [Tr. 181].

On March 10, 2009, Dr. Ed Atty performed an independent medical examination of Glass's left elbow following a workplace injury involving a heavy gate.  [Tr. 261-264].  Glass complained of shooting, stabbing pain in that extremity, with radiating pain in the shoulder and hands, including numbness in his fingers.  [Tr. 261].  During the examination, Glass also made

note of a May 2008 injury to his left elbow involving a 40 to 50 pound piece of luggage.  [*Id*.].  Glass reported some neck pain, and rated his overall amount of pain between six and eight out of ten.  [*Id*.].  Glass stated that the pain "interfere[d] significantly with his general activity, mood, work and sleep, and somewhat with his concentration."  [*Id*.].  He also stated that he took Vicodin two to three times daily, and used an over-the-counter brace to help his pain.  [Tr. 262].  Glass also stated that he was treated with Cortisone injections to the elbow, which mitigated his pain for between one and two days.  [*Id*.].

Dr. Atty found that Glass's cervical spine had "some mild limitation throughout the range of motion, [and was] more limited in extension."  [Tr. 263].  He noted minimal tenderness over the paraspinal muscles, but moderate tenderness over the left trapezius.  [Tr. 263].  Glass was limited on forward flexion and abduction to about eighty degrees in the left shoulder, with internal and external rotation moderately limited with pain upon the end of the range of motion.  [Tr. 263].  Glass experienced severe tenderness over the lateral epicondyle, with mild to moderate tenderness on the medial epicondyle.  [Tr. 263].  The Hawkins and supraspinatus test secondary could not be properly applied due to elbow pain, which Dr. Atty described as "hyper sensitivity to touch over the elbow area."  [Tr. 263].  Glass's left wrist had mild to moderate limitation of the range of motion, and his left grip demonstrated "weakness with increase in pain in the arm, especially at the elbow."  [Tr. 263].  Glass's gait was within normal limits.  [Tr. 263].  Dr. Atty's impression of Glass was that he suffered from "left hand numbness, possibly secondary to ulnar neuropathy.  Cannot rule out carpal tunnel syndrome.  Doubt cervical radiculopathy or plexopathy."  [Tr. 264].  He also suggested that Glass may suffer from "complex regional pain syndrome," that Glass has mild contracture of the left elbow in flexion, and "left shoulder adhesive capsulitis."  [Tr. 264].  Finally, Dr. Atty opined that Glass's injury

prevented him from lifting more than one to two pounds with his left upper extremity, that Glass was limited in terms of his "grasp and grip also of the left upper extremity," and that he should avoid above-the-shoulder activity and repetitive use of the left upper extremity.  [Tr. 264].

Glass was seen at the Seasons Counseling Center on February 15, 2011 at the behest of the Michigan Disability Determination Service.  [Tr. 185].  A Psychological Report was prepared by Carrie Gleason, Psy. D., a Limited License Psychologist, and by Dr. Matthew P. Dickson, Ph.D., a Licensed Psychologist.  Glass was found to "act intentionally obtuse at times," it was determined that his "mental abilities to understand, attend to, remember, and carry out instructions are moderately impaired," and that Glass's "abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are mildly impaired." [Tr. 185-187].  However, the report also noted that "it was not my impression that [Glass's] learning problems would significantly interfere with completion of unskilled work."  [Tr. 187] (emphasis in original).

On February 28, 2011, Glass was examined by consulting physician Dr. Asit Ray of Michigan Medical Evaluation, Inc.  [Tr. 189-192].  Dr. Ray determined that Glass "ambulat[ed] normally without any limp," had normal range of motion of the cervical and lumbar spine, normal range of motion in all joints, including the shoulders, elbows, hips, and wrists, and normal muscle strength.  [Tr. 189-197].  Dr. Ray found noted that Glass's "muscle strength remains normal," and that he is "independent in his self-care and activities of daily living."  [Tr. 191].

Glass was examined at the Hurley Medical Center on May 23, 2011, after suffering an injury to the fifth finger on his left hand.  [Tr. 211].  An x-ray of Glass's hand revealed "flexion deformity of the left little finger consistent with the ligamentous and tendinous injury" with "no

evidence of [an] associated fracture" but with "mild degenerative changes." [*Id*.]. He was prescribed Vicodin (for pain); the clinical impression was recorded as "tendon ruptured." [*Id*.]. He was discharged several hours later on May 24, 2014. [*Id*.].

Glass was re-admitted to the Hurley Medical Center on May 25, 2011 for treatment of an "IRREDUCIBLE PIP JOINT [proximal interphalangeal joint] DISLOCATION LEFT SMALL FINGER." [Tr. 201]. Dr. Stephen Morris recorded that Glass "injured his left small finger playing basketball," and that attempts to reduce the dislocation without surgery were unsuccessful. [Tr. 204]. Dr. Morris performed an "OPEN REDUCTION DISLOCATED PIP JOINT" surgery on Glass on May 31, 2011. [Tr. 201]. Dr. Morris further noted that Glass was "advised that there will be considerable postoperative stiffness, that it is likely to be long lasting in this joint and [with] long-lasting discomfort. This is not a very forgiving joint." [Tr. 204]. Glass was discharged from Hurley Medical Center on May 31, 2011. [*Id*.].

On October 6, 2011, a Disability Determination Explanation as to Glass's mental impairments was prepared by consulting physician Dr. Jerrold Heinrich, Ph.D. (and as to his physical impairments by examiner Douglas Chang). [Tr. 45-57]. Importantly, Dr. Heinrich, although finding Glass capable of performing work involving one to two-step instructions, found that Glass could do so only "within an organized work setting **where speed of performance was not essential for the work tasks**." [Tr. 54-55] (emphasis added).

The record contains miscellaneous medical notes from Dr. Horace Davis and Dr. Youssef ranging from January 13, 2011, to September 1, 2012. [Tr. 213-235; 241-245; 248-252; 266-280]. These notes record information about Glass's physical condition. The word "disabled" can be made out the May 5, 2011, note, and is repeated on each of Dr. Youssef's three subsequent notes on June 1, 2011; July 7, 2011; and August 2, 2011. [Tr. 213-216]. No

symptoms or prognoses are mentioned in relation to this determination.  The notes also appear to record basic vital information about Glass, including his blood pressure, pulse, reported pain, and prescribed medicines.

Glass again sought treatment from the Genesys Regional Medical Center on August 6, 2011, due to a car crash.  [Tr. 236-240].  Dr. Khalid Iatif prepared a radiology report in which he stated that that Glass's hand suffered "no acute fracture or dislocation," but revealed an "[o]ld deformity of the little finger from previous trauma" and that the "interphalangeal joint has remain [sic] unchanged when compared to 4/24/2010."  [Tr. 239].  An x-ray of Glass's spine showed "[m]inimal grade 1 retrolisthesis of C5 and C6," with "[n]o acute fracture," and "[u]ncinate spurs . . . seen encroaching upon C5-6 exit foramen on the left side."  [Tr. 240].

That same day, Dr. Javier Morales of Genesys Regional Medical Center examined Glass and prepared a clinical report of his findings.  [Tr. 236-238].  Glass suffered mild abrasions and tenderness in his neck, lower back, right forearm, both knees, and his left fifth toe.  [Tr. 236].  Glass experienced vertebral point tenderness, with "limited [range of motion] in the back."  [Tr. 237].  Dr. Morales also noted swelling in Glass's left hand "to proximal joint of left pinky," and tenderness in both knees.  [Tr. 237].  Dr. Morales found that an x-ray of Glass's cervical spine showed no acute findings, with normal soft tissue, and no fracture, bony lesions, or subluxation.  [Tr. 237].  He recommended that Glass wear a soft neck collar as needed, that Glass perform no strenuous activity until released, and prescribed Glass with Vicodin (for pain) and Flexeril (for muscle spasms).  [Tr. 237].

Dr. Youssef examined Glass on July 26, 2012, and completed a medical source statement.  [Tr. 253-259].  Dr. Youssef found that Glass was able to lift ten pounds occasionally, less than ten pounds frequently, was limited to walking or standing less than two hours in an

eight-hour workday, required a hand-held assistive device for ambulation, could only sit for six hours in an eight-hour workday, and had limited pushing and pulling abilities due to back pain. [Tr. 253-254].  Dr. Youssef also noted that an MRI of Glass's spine showed "bulging discs [at] multiple sites."  [Tr. 254].  He found that Glass was able to occasionally balance, kneel, or crouch.  [Tr. 254].  Glass's reaching, fingering, and feeling were all listed as unlimited, while handling was listed as limited.[1]  [Tr. 255].  Dr. Youssef found that Glass could perform handling "occasionally," and that Glass's "gross manipulation is limited due to severe chronic back and knee pain."  [Tr. 255].  Regarding environmental limitations, Dr. Youssef found that Glass should not be exposed to temperature extremes, vibration, humidity, wetness, or hazards such as machinery and heights.  [Tr. 255].

Dr. Youssef also prepared a statement regarding Glass's mental ability to do work-related activities.  [Tr. 257-259].  He found that Glass suffered from "marked" limitations in all areas of psychological functioning, including understanding, remembering, carrying out, and making simple judgments regarding simple or complex issues.  [Tr. 257].  Similarly, he found that Glass's abilities to interact appropriately with the public, supervisors, or co-workers, and to respond appropriately to usual work situations was markedly impaired.  [Tr. 258].[2]

### 4.   Vocational Expert's Testimony

The VE characterized Glass's past relevant work as being unskilled and requiring medium exertion.  [Tr. 41].  The ALJ asked the VE to imagine a claimant of Glass's age,

---

[1] The boxes for "limited" and "unlimited" are both checked for the category of handling.  Given that Dr. Youssef then describes the extent of Glass's handling limitations, it appears that he intended to check the "limited" box.  [Tr. 255].

[2] Dr. Youssef seems to have misinterpreted the question prompts with regard to Glass's mental limitations.  He marked "no" in response to questions inquiring whether Glass's mental abilities are affected by his impairment, yet Dr. Youssef went on to detail the extent of those limitations. The Court thus assumes Dr. Youssef intended to answer yes to these questions.  [Tr. 257-258].

education, and work experience, who was able to perform light unskilled work, with the following limitations: only occasional climbing of ladders, ropes, or scaffolds; frequent climbing of ramps or stairs; frequent balancing, stooping, kneeling, crouching, or crawling; frequent reaching with his right upper extremity; and who is limited to occasional changes in work setting. [Tr. 42]. The VE determined that such a person could not perform any of Glass's past work. [*Id*.]. However, the VE testified that the hypothetical individual would be capable of working in the position of inspector (8,000 jobs in the Lower Peninsula of Michigan), visual inspector (2,200 jobs), and sorter (1,300 jobs). [*Id*.].

### C.      Framework for Disability Determinations

Under the Act, SSI is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

11

> Step Five:  Even if the claimant is unable to perform his or her past
> relevant work, if other work exists in the national economy that the
> claimant can perform, in view of his or her age, education, and work
> experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing

20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers

to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir.

1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Glass not disabled under the

Act.  At Step One, the ALJ found that Glass has not engaged in substantial gainful activity since

June 15, 2011, the application date.  [Tr. 17].  At Step Two, the ALJ found that Glass has the

following severe impairments: degenerative disc disease and a depressive disorder, not otherwise

specified.  [*Id.*].  At Step Three, the ALJ found that Glass does not have an impairment or

combination of impairments that met or medically equaled a listed impairment.  [Tr. 17-18].

Next, the ALJ assessed Glass's residual functional capacity ("RFC"), finding him capable

of light work as defined in 20 CFR 416.967(b), except:

> [he] can occasionally climb ladders, ropes or scaffolds and can frequently
> climb ramps or stairs.  He can frequently balance, stoop, kneel, crouch, or
> crawl.  He is limited to frequent reaching with his right upper extremity.
> His psychological symptoms limit him to unskilled work as defined by the
> regulations that has only occasional changes in the work setting.

[Tr. 19].  At Step Four the ALJ concluded that Glass is unable to perform his past relevant work.

[Tr. 22].  At Step Five, the ALJ concluded, based in part on VE testimony, that Glass is capable

of performing a significant number of jobs that exist in the national economy.  [Tr. 23].  As a

result, the ALJ concluded that Glass is not disabled under the Act. [*Id.*].

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the

Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.     Analysis

#### 1.     *The ALJ Erred by Failing to Include a "Speed of Performance" Limitation in the VE Hypothetical and RFC*

The ALJ found that, with regard to concentration, persistence or pace, Glass has moderate difficulties.  [Tr. 18].  In turn, the ALJ (in his hypothetical to the VE and in RFC he ultimately adopted) limited Glass to "unskilled work as defined by the regulations[3] that has only occasional changes in the work setting."  [Tr. 19, 42].  Glass argues that these limitations were inadequate because they "did not include moderate limitations on his ability to concentrate, stay on task and keep pace."  [10 at 5].  More specifically, Glass argues that the ALJ erred by according "great weight" to the Dr. Heinrich's opinion, which found that Glass had moderate limitations in his ability to "maintain attention and concentration for extended periods," "perform activities within a schedule, maintain regular attendance, and be punctual within customary

---

[3] The regulations define "unskilled work" as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time…"  20 C.F.R. § 404.1568.

tolerances," and that Glass "could concentrate and persist adequately on tasks within an organized work setting where speed of performance was not essential" [Tr. 54-55], but then limiting him (in both the VE hypothetical and ultimate RFC) merely to "unskilled work" with "only occasional changes in the work setting."[4]

Where the ALJ finds that a claimant has CPP deficiencies, failure to account for such deficiencies in the hypothetical question generally constitutes reversible error. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 517 (6th Cir. 2010). While an ALJ is not required to include any particular phrase or talismanic language in an RFC to properly account for a claimant's CPP limitations, the hypothetical limitations chosen by the ALJ must be supported by substantial evidence. *Barnes v. Comm'r of Soc. Sec.*, No. 12-CV-15256, 2013 WL 6328835, at *14 (E.D. Mich. Dec. 5, 2013) (citing *Smith v. Halter*, 307 F.3d 377, 378–79 (6th Cir. 2001)). "[T]here is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Taylor v. Comm'r of Soc. Sec.*, No. 10-CV-12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011) report and recommendation adopted, No. 10-12519, 2011 WL 2682892 (E.D. Mich. July 11, 2011).

Some courts have held that an RFC which merely limits claimants to "unskilled work," "simple tasks," or "routine tasks" is insufficient to account for CPP deficiencies. *See, e.g., Green v. Comm'r of Soc. Sec.*, No. CIV. 08-CV-11398-DT, 2009 WL 2365557, at *10 (E.D.

---

[4] Actually, in the paragraph addressing Glass's CPP limitations, the ALJ wrote that he was giving "great weight" to the consultant's opinion "that [Glass] had mild limitations with respect to *activities of daily living*." [Tr. 18]. However, the ALJ had already addressed Glass's activities of daily living two paragraphs earlier, and it seems clear – just as Glass argues – that the ALJ intended to write that he was giving great weight to the consultant's *CPP findings*.

Mich. July 28, 2009); *Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842, 849 (E.D. Mich. 2007). Similarly, this court recently held that limiting a claimant to "simple routine tasks with only occasional change in work setting" was insufficient to accommodate a claimant's moderate deficits in CPP because "a claimant with moderate deficits in concentration, persistence, or pace may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job." *Tolles v. Comm'r of Soc. Sec.*, No. 12-CV-14771, 2013 WL 5707788, at *9 (E.D. Mich. Oct. 21, 2013) (quotation omitted).

At the same time, other courts in this jurisdiction have found that, under certain circumstances, limitations similar to those imposed by the ALJ here were sufficient to account for the claimant's particular CPP deficiencies. *See, e.g., Latarte v. Comm'r of Soc. Sec.*, No. CIV A 08-13022, 2009 WL 1044836, at *3 (E.D. Mich. Apr. 20, 2009) (holding that the moderate CPP limitations of a claimant who retained the ability to perform simple tasks on a sustained basis were accurately described by a hypothetical limiting the claimant to "unskilled work"); *Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005) (finding that, by limiting the claimant to "simple and rote type job tasks" in his hypothetical, the ALJ sufficiently accounted for his finding that claimant "often" experiences issues with CPP).

The facts here make this case more similar to the first category of cases, where a broad limitation to "unskilled" work does not adequately reflect the claimant's CPP limitations. It is important to note that the ALJ indicated that he was giving "great weight" to the Dr. Heinrich's opinion. [Tr. 55]. Thus, one would expect that all significant CPP limitations imposed in that opinion would be reflected in the ALJ's hypothetical question to the VE, and ultimately in the claimant's RFC. Here, however, the ALJ omitted one important and specific CPP limitation determined by Dr. Heinrich. Although Dr. Heinrich found that Glass could "understand,

remember, and execute consistently one to two-step instructions," [Tr. 54], he went a step further in his "narrative explanation" of Glass's CPP limitations, explaining:

> [Glass] could concentrate and persist on tasks within an organized work setting **where speed of performance was not essential for the work tasks.**

[Tr. 55] (emphasis added).

The ALJ omitted this pace limitation in his hypothetical to the VE (and in his RFC), and did not offer any reason for not including it. This makes Glass's case similar to *Ealy*. In *Ealy*, the ALJ gave great weight to the opinion of a state agency psychological consultant, which found that the claimant "could complete simple repetitive tasks for two-hour segments over an eight-hour day where speed was not critical." 594 F.3d at 509. However, the ALJ's hypothetical did not incorporate the pace limitation, stating instead only that the hypothetical worker was "limited to simple, repetitive tasks and instructions in non-public work settings." *Id.* at 510. The Sixth Circuit Court of Appeals found that the ALJ erred by "omit[ing] [the consultant's suggested] restrictions – in pace, speed, and concentration – that both [the consultant] and the ALJ found Ealy to have," and that the hypothetical should have "included the restriction that Ealy could work two-hour segments during an eight-hour work day, and that speed of his performance could not be critical to his job." *Id.* at 516.[5]

_____

[5] It is also noteworthy that other courts in this circuit have found that each of the three positions suggested by the VE – sorter, inspector, and visual inspector – require substantial concentration, and may not be appropriate for claimants with certain CPP deficiencies. *See Crooks v. Comm'r of Soc. Sec.*, No. 2:13-CV-605, 2014 WL 2608170, at *6 (S.D. Ohio June 11, 2014) report and recommendation adopted, No. 2:13-CV-605, 2014 WL 2988340 (S.D. Ohio July 2, 2014) (noting that an "inspector" job would presumably include pace demands beyond the abilities of a claimant with moderate CPP limitations); *Teal v. Comm'r of Soc. Sec.*, No. 10-13154, 2011 WL 4484864, at *5 (E.D. Mich. Sept. 26, 2011) (stating that a "visual inspector" position requires "a significant amount of concentrated effort"); *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 931 (E.D. Mich. 2005) (noting that sorting work requires "a degree of sustained concentration, persistence and pace").

The Court rejects the Commissioner's argument that the opinion of consulting physician Dr. Matthew P. Dickson, Ph.D., who examined Glass and prepared a Michigan Disability Determination Service Psychological Report, compels this Court to affirm the ALJ's decision. Dr. Dickson found that Glass's "abilities to understand, attend to, remember, and carry out instructions are moderately impaired," yet concluded: "it was <u>not</u> my impression that [Glass's] learning problems would significantly interfere with completion of unskilled work." [Tr. 187] (emphasis in original). This does not change the Court's analysis for two reasons. First, as noted above, the ALJ expressly stated that he was giving "great weight" to the Dr. Heinrich's opinion, and then, without explanation, omitted a specific pace limitation that that doctor had imposed. Second, the mere fact that Dr. Dickson did not believe that Glass's "learning problems" would impact his ability to perform unskilled work does not necessarily answer the question of whether Glass's mental impairments (which seem to be broader than mere "learning problems") mandate a pace limitation.

In sum, for the foregoing reasons, the Court finds that the ALJ's hypothetical and ultimate RFC are not supported by substantial evidence. Thus, it recommends remanding this matter for further consideration by the ALJ.

### 2.[6]   *The ALJ's Decision to Not Include All of Glass's Alleged Physical Limitations is Supported by Substantial Evidence*

Glass also alleges that the ALJ failed to include in his RFC assessment certain of Glass's physical limitations as found by the consulting examiner. [10 at 5]. First, Glass argues that the ALJ should have limited his ability to push or pull with his left extremity, or to use his left extremity for activities overhead, in front, or laterally. Glass recognizes that the RFC does "limit

---

[6] Because the Court is recommending remanding the matter based on the error discussed above, it need not address each of Glass's other alleged errors. It addresses some of them below, however, in an effort to streamline the subsequent review process.

the use of the Plaintiff's <u>right</u> upper extremity to 'frequent reaching,'" but argues that this restriction is insufficient because Glass suffers limitations to his left hand, not his right hand.  [10 at 6, 10].  However, the ALJ correctly noted that Glass's left extremity is limited in numerous places throughout his decision, and thus clearly understood the nature of Glass's limitation.  [Tr. 19, 20, 22].  This drafting mistake thus had no impact on the outcome of the ALJ's decision, and does not constitute reversible error.  *See Hulse v. Comm'r of Soc. Sec.*, No. 08-11154, 2009 WL 499117, at *4 (E.D. Mich. Feb. 26, 2009) (holding that an ALJ did not commit reversible error by mistakenly restricting use of the left rather than right hand in a hypothetical question to a vocational expert).

Next, Glass argues that, because the ALJ accorded great weight to the opinion of the consulting examiner, he should have included the limits to Glass's use of his left extremity suggested by the consultant.  [10 at 5].  Specifically, the consultant opined that Glass's ability to push or pull with his left arm would be limited to "occasionally" because of pain.  [Tr. 52].  The consultant similarly limited Glass's ability to climb ropes, ladders, or scaffolds to "occasionally," and his ability to reach left overhead, in front, or laterally was "limited."  [Tr. 52-53].

Glass is incorrect in his assertion that the ALJ gave great weight to the physical limitations found by the consultant.  Instead, the ALJ gave great weight only to *Dr. Heinrich's* findings in four separate respects: Glass's activities of daily living; social functioning; concentration, persistence, pace; and episodes of decompensation.  [Tr. 18].  In discussing Glass's physical limitations, the ALJ made no mention of the consultant's report.  Moreover, Dr. Heinrich evaluated Glass's mental impairments, whereas the consultant who assessed Glass's physical limitations is listed as Douglas Chang.  [Tr. 53].  Because there is no indication that Chang has medical credentials, his opinion cannot be given any weight.  *See Fugate v. Colvin*,

No. CIV.A. 13-190-DLB, 2014 WL 1408055, at *2 (E.D. Ky. Apr. 11, 2014).  In sum, contrary to Glass's contention, the ALJ did not assign great weight to a consultant's opinion regarding his physical limitations, and thus Glass's argument does not identify an inconsistency between the ALJ's evaluation of the evidence and the RFC he ultimately adopted.

### 3.   The Physical RFC is Supported by Substantial Evidence and is Consistent with the Treating Physician Rule

Next, Glass claims that the ALJ's RFC determination is not supported by substantial evidence, and improperly ignores medical opinions of his treating physicians.  [10 at 6-9].  The first part of Glass's argument relates to the "timeline" of the evidence cited by the ALJ.  Glass claims that the ALJ "only cites medical evidence submitted prior to June 15, 2011 [the date of his second application for disability benefits] to support his unfavorable decision," while ignoring more recent evidence.  [10 at 6].  Glass also notes that Dr. Dickson, whose opinion the ALJ gave great weight, was not privy to the opinions of treating physicians Dr. Davis and Dr. Youssef, and that his examination occurred prior to Glass's car accident and subsequent hand surgery.  [10 at 7].  These arguments lack merit.

Glass argues that the ALJ erred by pointing to Dr. Ray's February 28, 2011, examination to demonstrate that Glass suffered no lasting impairment as a result of his subsequent August 6, 2011, motor vehicle accident.  [10 at 4].  Glass has misread the ALJ's decision; rather than citing Dr. Ray's examination to discount Glass's injuries from the vehicle crash, he points to "recent medical evidence of record referenced above."  [Tr. 22].  The ALJ appears to be referencing Dr. Davis's 2012 treatment notes [Tr. 266-277], which he described earlier in the decision as "the most recent treatment records."  [Tr. 21].  Despite their conclusory nature, Dr. Davis clearly indicated in his notes that Glass's spine was "WNL" or "within normal limits;" the notes do not indicate any other injuries which might be connected with Glass's vehicle accident.  [Tr. 268].

20

Glass next notes that the ALJ incorrectly categorized him as a "younger individual" at the time he filed his second application for SSI.  [10 at 5].  This appears to be the result of a miscalculation by the ALJ, who correctly listed Glass's birthday and age at the time of application (52), but nevertheless wrote that Glass was a "younger individual age 18-49."  [Tr. 22].  It seems that this error is immaterial, as the Medical Vocational Guidelines establish that a claimant who is rapidly approaching advanced age, has limited or less education, and is unskilled or has no skills is not presumptively disabled.  20 C.F.R. § Pt. 404, Subpt. P, App. 2, Rule 202.10.  However, on remand, the ALJ should perform a proper analysis of the issue using Glass's correct age classification.

Glass also argues that the ALJ failed to properly consider the opinions of his treating physicians.  An ALJ must give a treating physician's opinion "controlling weight" if it is consistent with the evidence in the record and supported by sufficient clinical findings.  *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir.2007).  However, an ALJ is not required to assign greater weight to the opinion of a treating source than a non-treating source.  *See Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011) ("There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record.  The opinions need only be 'supported by evidence in the case record.'").  Additionally, the ALJ must consider the opinion of all treating physicians, and give good reasons for the weight given to the opinion of each treating source.  *See Fisk v. Astrue*, 253 F. App'x 580, 584 (6th Cir. 2007).  As discussed below, the Court finds that the ALJ did not err in his consideration of Glass's treating physician opinions.

### a.      *Dr. Ray's Medical Reports*

The ALJ found that Dr. Ray's consultative evaluation of Glass was "the best indication of

the claimant's condition" and "consistent with the most recent treatment records, which indicate a generally normal physical examination." [Tr. 21]. Dr. Ray stated in his February 28, 2011, examination report that "Glass would be able to perform his usual and customary activities including his occupational duties without any restrictions." [Tr. 192]. This report is confirmed by Dr. Davis's September 2012 examination notes, which, despite recording the words "radiculopathy" and "disabled," also found that Glass's physical condition was generally within normal limits. [Tr. 266]. Thus, there is substantial evidence supporting the ALJ's determination that Glass is capable of frequent reaching with his left arm.

### b.     Dr. Youssef's Medical Reports

The ALJ properly discounted Dr. Youssef's opinion. [Tr. 21-22]. Office treatment records prepared by Dr. Youssef between April 18, 2009, and August 8, 2011, do not contain any medical opinions whatsoever, but rather seem to record observations about Glass's blood pressure, tobacco use, prescribed pharmaceuticals, and which of his bodily systems appeared to be within normal limits. [Tr. 213-231]. Beginning on May 5, 2011, all of Dr. Youssef's treatment notes contain the word "disabled," though the location of this note (in the chief complaint section) appears to be a reflection of Glass's complaints rather than Dr. Youssef's opinion. [Tr. 216]. Notes prepared by Dr. Youssef between September 3, 2011, and June 2, 2012, contain similar remarks, and do not appear to express any form of medical opinion on the part of Dr. Youssef. [Tr. 241-252]. An ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001) (citation omitted). The ALJ thus had good reasons to accord no weight to these treatment notes, and he committed no error in not discussing these notes in his decision. *Kornecky*, 167 Fed. Appx. at 508.

22

Dr. Youssef also prepared mental and physical medical source statements on July 26, 2012. [Tr. 253-259]. As discussed *supra* at 8-10, Dr. Youssef opined that Glass suffers from numerous physical and mental limitations. He also found that a MRI of Glass's spine showed "bulging discs at multiple sites." [Tr. 254]. The ALJ properly discussed these findings, and discounted them because they are inconsistent with other substantial medical evidence. [Tr. 21-22].

The ALJ properly discussed Dr. Youssef's MRI interpretation, noting that his analysis is inconsistent with the evidence of record. [Tr. 22]. Dr. Youssef appears to have based his opinion of Glass's spine solely on an MRI performed on May 2, 2007, which Dr. Madhusudana Tummala of the MRI Diagnostic Centers of Michigan described as showing "minimal circumferential bulging" in two discs, with "no evidence of disc herniation or spinal stenosis," and with "no significant abnormality" on the post-contrast images. [Tr. 198]. Glass argues that the ALJ erred by using outdated information to critique Dr. Youssef's findings, and by ignoring x-ray evidence prepared in 2011. Yet it appears from the record that Dr. Youssef evaluated the same 2007 MRI which Dr. Tummala used to formulate his opinion. While it is possible that the 2007 MRI does not accurately reflect Glass's present medical condition, he presents no argument as to why Dr. Youssef's interpretation of that same outdated evidence is superior. Moreover, the x-ray performed on Glass's spine in 2011 actually undercuts the credibility of his alleged spinal injuries. [10 at 4]. On August 6, 2011, shortly after Glass's automobile accident, Dr. Khalid Iatif of the Genesys Regional Medical Center prepared a radiology report, finding "[m]inimal grade 1 retrolisthesis of C5 and C6," with "[n]o acute fracture," and "[u]ncinate spurs . . . seen encroaching upon C5-6 exit foramen on the left side." [Tr. 240]. And, in a clinical report prepared that same day, Dr. Javier Morales stated that an x-ray of Glass's cervical spine revealed

"[n]o acute findings.  Soft tissue normal.  No fracture or subluxation.  No bony lesion."  [Tr. 237].  Again, nothing in these findings appears to undercut Dr. Tummala's 2007 assessment, which further supports the ALJ's discounting of Dr. Youssef's interpretation of the MRI.

### c.      *Dr. Davis's Medical Reports*

The Court similarly finds no error in the ALJ's handling of the opinion of treating physician Dr. Davis.  While Glass argues that the ALJ failed to discuss the weight he assigned to Dr. Davis's opinions [10 at 8], as with Dr. Youssef's treatment notes, Dr. Davis's records provide only conclusory statements about Glass's condition; they contain words like "disabled," "body aches," and "weakness/numb/tingling/cramps."  [Tr. 213-216].  Because these conclusory statements provide no objective or reasoned basis on which they can be judged, the ALJ was not bound to accept them.  *See Buxton*, 246 F.3d at 772; *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (holding that a physician's statement which merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all."); *Mohssen v. Comm'r of Soc. Sec.*, No. 12-14501, 2013 WL 6094728, at *9 (E.D. Mich. Nov. 20, 2013) (noting the distinction between a doctor's notes for the purpose of treatment which merely record symptoms and vital statistics, a doctor's ultimate opinion about the patient's symptoms, diagnosis, prognosis, and restrictions, and concluding that the former does not constitute an "opinion."). Dr. Davis's notes merely opine that Glass was disabled without offering any discussion of the cause, severity, symptoms, prognosis, or any other details which might substantiate that assertion.  Moreover, to the extent that Dr. Davis opined that Glass was disabled, his opinion is not due any special deference because this determination is reserved to the Commissioner.  *See Pratt v. Comm'r of Soc. Sec.*, No. 1:13-CV-872, 2014 WL 5039459, at *7 (W.D. Mich. Sept. 24, 2014) (citing 20 C.F.R. § 404.1527).

### III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **[11]** be **DENIED**, Glass's motion **[10]** be **GRANTED IN PART** to the extent it seeks remand, and **DENIED IN PART** to the extent that it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.


Dated: January 16, 2015                     s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 16, 2015.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager